[Cite as *State v. Mapp*, 2024-Ohio-5493.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                          :

    Plaintiff-Appellee,                          :

                                               No. 23AP-65

v.                                                            :        (C.P.C. No. 20CR-5687)

Shawn Mapp, Jr.,                                   :        (REGULAR CALENDAR)

    Defendant-Appellant.                    :

---

D E C I S I O N

Rendered on November 21, 2024

---

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Paula M. Sawyers*, for appellee. **Argued:** *Paula M. Sawyers*.

**On brief:** *Campbell Law LLC*, and *April F. Campbell*, for appellant. **Argued:** *April F. Campbell*.

---

APPEAL from the Franklin County Court of Common Pleas

BEATTY BLUNT, J.

{¶ 1} Defendant-appellant, Shawn Mapp, Jr., appeals the judgment of the Franklin County Court of Common Pleas following jury verdicts of guilt to one count of aggravated murder with specifications, two counts of murder with specifications, one count of attempted murder with specifications, and one count of felonious assault with specifications, and a bench verdict of guilt to one count of having weapons under disability. Both counts of murder were held to be allied offenses to the aggravated murder, and the felonious assault was allied to the attempted murder. The state elected that Mapp should be sentenced for aggravated murder and attempted murder, and the trial court sentenced

Mapp to an aggregate indefinite minimum term of 50 years to life and an aggregate maximum term of 55.5 years to life.

{¶ 2} Mapp was convicted of shooting and killing Adrian Hardy and seriously injuring Hardy's date Cheniqua Barton at Donerick's Bar in Franklin County on October 19, 2020. At trial, Barton testified that she had met Hardy on October 17 at a different bar, that she and Hardy exchanged phone numbers, and that the next day they agreed to meet up at Donerick's on October 19. They met in the parking lot and went inside at around 6:30 p.m., and almost immediately thereafter encountered a man in a green jacket that Hardy apparently knew but Barton did not.

{¶ 3} There is surveillance video of this man speaking with Hardy inside the bar, and of Hardy and the man moving away from Barton to continue their talk. Shortly after the talk ended without any obvious conflict, Barton and Hardy left the interior of the bar and walked the rear hallway past the bathrooms into the enclosed back patio area, which also serves as a second entrance to the bar. For the next several minutes, the green-jacketed man is visible on surveillance video making a phone call and texting. Then, at about 7:45 p.m., two men enter the bar from the patio area. Security video from the next-door Coast Guard Recruiting Station shows these men arriving at the back parking lot and moving toward the patio. (*See* State's Ex. G, Coast Guard Video, Outside Back Door at 2:33 through 2:34).[1] Once they arrived inside the bar, they can be seen approaching the green-jacketed man and speaking with him. (State's Ex. C, Surveillance Video ch1_main time

---

[1] An unidentified man with a backpack can be seen walking across the parking lot toward the patio approximately eight minutes after the two men arrive. Under a minute later, he walks back across the parking lot away from the patio in the opposite direction. (*See*, State's Ex. G, Coast Guard Video, Outside Back Door at 2:42 through 2:44). Mapp's attorney argued that this man could have been the shooter. (*See, e.g.*, Oct. 25, 2022 Tr. Vol. 10 at 367-68.) The state responded that, based on its analysis of the Coast Guard Video, which did not have a time clock, this man did not even approach the bar "until at least four to five minutes after the shooting." (Oct. 27 & 28, 2022 Vol. 12 at 691-92.)

stamp 10-19-2020 7:46:00 p.m. through 10-19-2020 7:48:21 p.m.) At that point, around 7:48 p.m., the green-jacketed man pays his tab, leaves his drink unfinished, and moves towards the back patio. He stops and enters the bathroom, but exits just a few seconds later, and then opens the door onto the patio. (State's Ex. C, Surveillance Video ch5_main time stamp 10-19-2020 7:48:35 p.m. through 10-19-2020 7:48:55 p.m.)

{¶ 4} According to Cheniqua Barton, the green-jacketed man entered the patio and immediately approached Hardy, gave him a handshake, and pulled him close. He then took a few steps back towards the bar, but instead of leaving pulled out a gun and shot both Hardy and Barton. (Oct. 25, 2022 Tr. Vol. 10 at 367-68.) The green-jacketed man then walked back through the patio door back into the bar's rear hallway. (State's Ex. C, Surveillance Video ch5_main time stamp 10-19-2020 7:49:36 p.m. through 10-19-2020 7:49:44 p.m.) He continued into the main part of the bar itself—on surveillance video he can be seen walking from the rear area of the bar past the bar employees, briefly exchanging a few words with one of the two men that he had spoken with a few minutes prior and slowly walking out the front door. (State's Ex. C, Surveillance Video ch1_main time stamp 10-19-2020 7:49:49 p.m. through 10-19-2020 7:50:10 p.m.) Based on the bar surveillance video, this entire series of events—the green-jacketed man paying his tab and walking to the back of the bar, stopping in the bathroom, going out onto the patio, shooting Hardy and Barton, and then walking back into the bar and out the front door, took place in under three minutes. (State's Ex. C, Surveillance Video ch1_main time stamp 10-19-2020 7:47:50 p.m. through 10-19-2020 7:50:10 p.m.)

{¶ 5} One of the bullets entered Hardy's head at close range above his left ear, and he died within minutes. (State's Ex. K, Coroner's Report.) Barton was hit in the abdomen and her injuries required multiple surgeries, including a small bowel transplant. (Oct. 25,

2022 Tr. Vol. 10 at 395-97.)  When she was interviewed 11 days later, Barton was not able to identify the green-jacketed man who shot both her and Hardy.  But after viewing the bar surveillance video at trial, Barton immediately identified the green-jacketed man as the shooter.  As part of a stipulation agreeing to the admission of the surveillance video without foundational testimony, the parties agreed that "the man seen throughout the video wearing a green jacket sitting at the corner of the bar is Shawn Mapp."  (Joint Ex. C-1, Stipulation of the Parties.)  Additionally, DNA evidence obtained from the rim of the glass that the green-jacketed man was drinking from, as well as the top of the bar where the man was sitting, was nearly certain to have come from Shawn Mapp.  (State's Ex. L, DNA Analysis Report.)

{¶ 6}   Derek Bowser was working as a bar back at Donerick's on the night of the shootings. When he heard shots coming from the back patio, he immediately headed that direction from inside the bar to investigate.  As he moved towards the patio, a bar regular that he knew as "Shiz" walked past him toward the front of the bar, going the opposite direction from the patio, and gave him a "weird look."  (Oct. 26, 2022 Tr. Vol. 11 at 426-27). When Bowser opened the door to the back patio, he saw a man—whom he subsequently learned was Adrian Hardy—in a pool of blood, and a woman—Chequina Barton—yelling for help. He did not see anyone else on the patio. After reviewing the bar surveillance video, he identified the man in the green jacket as "Shiz" (*Id*. at 436), and identified state's exhibit I-2, a photograph of Shawn Mapp, as a photograph of "Shiz." (*Id*. at 437-38.)

{¶ 7}   Columbus Police Officer Jennifer Reynolds responded to Donerick's at around 7:50 p.m. and parked in the back lot. She entered the back door of the patio, discovered Hardy and Barton, and began to move things around to facilitate space for emergency medical services to work. (Oct. 25, 2022 Tr. Vol. 10 at 335-36.)  She was able to

briefly talk to Barton and get limited identification information.  Officer Richard Bair, with the Columbus Police Department Crime Scene Search Unit, indicated that he responded to the scene with other officers, and took photographs of the area and evidence collected from it.  (Oct. 26, 2022 Tr. Vol. 11 at 461.)  He observed that shell casings were recovered from both the patio and from the back parking lot, but that unlike those found in the parking lot, all the shell casings on the patio were all .40 caliber.  (*Id.* at 468-69.)

{¶ 8}    Mapp was ultimately apprehended, arrested, and charged with the shootings. And while he was in the Franklin County jail awaiting trial, he apparently began speaking and playing chess with an elder inmate named Sylvester Cowan, who had been "involved with the law" and violent crimes for approximately 43 years. (*Id.* at 582-83.) Cowan reported that he spoke regularly with Mapp during February and March of 2022, and stated that Mapp had told him that "somebody he had bought some drugs and he got in touch with somebody to get him -- he wanted to get some a large amount of drugs.  Guy took him and caught some. And about three days later he was set up, his house was broken in to or something and he figured the guy set him up; came back and broke into his place and took the drugs from him." (*Id.* at 494.)  Cowan stated that while he had no personal knowledge of any drug transactions, Mapp told him that had arranged to purchase fentanyl and methamphetamine from an unnamed man, but that a few days later the drugs were stolen from Mapp's residence and that he suspected that man had stolen them back.  Cowan also stated that Mapp had told him he located the man in "a strip club" and confronted him, and that the man had warned him not to "pull out a gun. People in here.  Everybody going to see it."  (Oct. 26, 2022 Tr. Vol. 11 at 535.)  Cowan indicated that Mapp told him that he decided to wait for a "better opportunity," that Mapp stated he had approached the man "in the back of the bar," that "there wasn't no cameras back there," that Mapp had told him that

"he shot him and the other lady," and that Mapp had stated he left out the front door "[b]ecause he didn't want nobody to see him go in the back and not come out the back." (*Id.* at 539.)

{¶ 9} Mapp was ultimately tried for the shootings, found guilty, and sentenced. This timely appeal followed, and Mapp now asserts five assignments of error with the trial court's judgment. We address each in turn.

> **First Assignment of Error:** Counsel was ineffective for not moving to dismiss Mapp's case when the trial court would have discharged Mapp from prosecution, because the State violated his statutory and constitutional right to a speedy trial.

{¶ 10} The right to a speedy trial in criminal prosecutions is guaranteed by the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution. *State v. Smith*, 10th Dist. No. 19AP-170, 2021-Ohio-1936, ¶ 38. There is also a statutory right to a speedy trial under Ohio law—a person charged with a felony "[s]hall be brought to trial within two hundred seventy days after the person's arrest." R.C. 2945.71(C)(2). *See also* R.C. 2943.73(C)(2) (dismissal of felonies for statutory speedy trial violation). Ohio's speedy-trial statutes were implemented to incorporate the constitutional protections. *State v. Sellers*, 10th Dist. No. 08AP-810, 2009-Ohio-2231, ¶ 9.

{¶ 11} A defendant establishes a prima facie violation of his statutory speedy-trial right by demonstrating that more than 270 days elapsed before trial. *State v. Boyce*, 10th Dist. No. 19AP-313, 2021-Ohio-712, ¶ 11. Once a defendant establishes a prima facie case, the state bears the burden of proving that time was sufficiently tolled and the speedy-trial period extended. *Id.* The time within which to bring a defendant to trial may be extended for any of the reasons set forth in R.C. 2945.72. *State v. Brown*, 10th Dist. No. 19AP-40, 2019-Ohio-4753, ¶ 27. "Hence, the proper standard of review in speedy trial cases is to

simply count the number of days passed, while determining to which party the time is chargeable, as directed in R.C. 2945.72." *Id.*

{¶ 12} Appellate review of a trial court's decision on a motion to dismiss based on a speedy-trial violation involves a mixed question of law and fact. *State v. Bias*, 10th Dist. No. 21AP-329, 2022-Ohio-4643, ¶ 149. We must give deference to the trial court's findings of fact if they are supported by competent, credible evidence, but independently review whether the trial court properly applied the law to those facts. *Id.* On appeal of an order denying a motion to dismiss based on a statutory speedy-trial violation, we independently calculate whether the time to bring a defendant to trial expired. *Id. See generally State v. Williams*, 10th Dist. No. 18AP-891, 2023-Ohio-1002, ¶ 11-14.

{¶ 13} In general, claims of ineffective assistance of counsel are subject to the two-pronged analysis enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984). In accordance with the *Strickland* analysis, an applicant must show that (1) counsel's performance was objectively unreasonable, *id.* at 687, and (2) that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694.

{¶ 14} If a defendant's speedy-trial argument is correct, then counsel's performance would have been objectively unreasonable by not pressing the argument prior to trial, and if it is correct, there is more than a "reasonable probability" that the result of the proceeding would have been different—rather, there is a certainty that the outcome would have been different. Accordingly, when trial counsel is alleged to be ineffective for failure to assert the defendant's right to a speedy trial was violated, the speedy-trial analysis does not change in

any meaningful way. We therefore simply use the underlying speedy-trial law to determine whether a statutory speedy-trial violation actually occurred.

{¶ 15} Mapp was indicted in this case on December 4, 2020, and was arrested on that same date. A total of 690 days elapsed between Mapp's arrest and the commencement of his trial on October 24, 2022. At the time of his arrest, Mapp had three other Franklin County felony warrants stemming from the fact that on March 1, 2019, he had gone AWOL from house arrest, and he was held on two other cases throughout the pendency of this case. Because it is indisputable that Mapp was incarcerated on other cases in addition to this case, the triple-count provision of R.C. 2945.71(E) does not apply to the analysis of his claims. *Compare with State v. Butcher*, 27 Ohio St.3d 28, 29-31 (1986). Notwithstanding, the fact that he was not brought to trial within 270 days establishes a prima facie speedy-trial violation, and the burden therefore shifts to the state to demonstrate that time was tolled or that the defendant waived his right to a trial within the 270-day statutory period.

{¶ 16} On December 9, 2020, Mapp requested a continuance of his arraignment until December 14, 2020, and on that same date his then-attorney filed a request for discovery and a request for bill of particulars. A defendant's request for discovery from the state tolls the defendant's speedy-trial rights until discovery is provided or for a reasonable time, whichever is sooner. *See, e.g.*, *State v. Gonzales*, 10th Dist. No. 08AP-716, 2009-Ohio-3236, ¶ 22, citing *State v. Brown*, 98 Ohio St.3d 121 (2002), syllabus, and *Dublin v. Streb*, 10th Dist. No. 07AP-995, 2008-Ohio-3766. The state provided discovery to that attorney on January 13, 2021.

{¶ 17} A pretrial was scheduled for January 19, 2021, but on January 16, 2021, the court continued that pretrial to February 2, 2021 due to court closure. The trial date was subsequently continued to March 1, 2021 due to defense unavailability, and the defendant

filed a specific waiver of his speedy-trial rights for that period. And on March 1, 2021, defense counsel filed a motion for a competency evaluation of the defendant, which the trial court subsequently granted.

{¶ 18} The court continued the case until April 14, 2021, and on the following day, March 2, 2021, the court filed an entry memorializing that continuance, which included a waiver of speedy-trial rights for the period of the continuance signed by Mapp. On that same date, March 2, 2021, defense counsel filed a motion to withdraw, which was granted on March 8, 2021, and Mapp was appointed a new attorney on March 17, 2021. On March 24, 2021, Mapp's new attorney filed a request for discovery, and discovery was provided on April 14, 2021. On April 7, 2021, the court received a letter requesting additional time for the competency evaluation, and the competency report was subsequently filed on April 12, 2021. On April 15, the trial was continued to June 23, 2021 with the signed approval and waiver of speedy trial of Mapp's new counsel, although Mapp himself refused to sign the entry.

{¶ 19} On April 29, 2021, Mapp's attorney filed a motion for a second competency evaluation, which the court granted on May 3, 2021. On June 23, 2021 trial was again continued until August 9, 2021. Mapp again refused to sign the entry, which waived Mapp's right to speedy trial "for the period of this continuance as to the pending charge or charges," (June 23, 2021 Entry of Continuance), but his attorney approved and signed it. On July 19, 2021, Mapp's new attorney filed a motion to withdraw the request for a new competency evaluation as well as a request to reconsider Mapp's bond amount. On July 20, 2021 Mapp's trial, which had been set for August 9, was continued until August 12 with an entry that again included a waiver of speedy-trial rights for the period of the continuance—Mapp signed this entry. On August 3, 2021, the August 12 trial date was continued by agreement

and with Mapp's signed waiver of his speedy-trial rights, this time until October 10, 2021. And on October 6, 2021, trial was again continued by agreement with Mapp's waiver and signature, until January 24, 2022.

{¶ 20} On December 12, 2021, Mapp's attorney filed a motion to suppress all pretrial identification of the defendant, as well as a motion in limine regarding various photographs the state intended to introduce into evidence. The court scheduled those motions for hearing to be held January 13, 2022, but the court did not take any evidence, hear any argument or decide the motions on that date. Instead, the state requested a continuance of the trial (which was then scheduled for January 24, 2022) because of Cheniqua Barton's health concerns. Barton's injuries required her to be on medication which precluded her from receiving the COVID vaccine, and the trial date had been set during a wave of COVID infections. Mapp objected to the state's request, and expressed a willingness to have Barton testify by video if that was required, but the court granted the state's motion, and the case was continued for trial to May 9, 2022. Mapp's motions remained outstanding during this entire period.

{¶ 21} On May 9, 2022, the state again requested a continuance of the trial, as the lead prosecutor had to be replaced a week prior to the scheduled trial date. Mapp again objected to this request, but the court granted the motion, and the trial was continued until July 11, 2022. Mapp's motion to suppress and motion in limine remained undecided—in fact, he filed another separate motion in limine regarding Evid.R. 403(A) on June 22—but on June 24, 2022, Mapp filed a motion to depose Barton remotely and to permit her remote testimony at trial, based on her susceptibility to infection. The state opposed this motion.

{¶ 22} On July 11, 2022, the state again requested a continuance of the trial based on "new information" that could affect the case. (July 11, 2022 Tr. Vol. 6 at 2.) Although it

was not specifically revealed at the hearing, it subsequently emerged that this "new information" was the discovery of a new witness, specifically Sylvester Cowans. It was also mentioned at that hearing that Mapp's attorney had represented Cowans in a federal case some 18 years earlier, but because Cowans was still on supervised release on that federal case, Mapp's second attorney was "technically . . . still [Cowan's] counsel." (Aug. 10, 2022 Tr. Vol. 7 at 4.) The court granted the state's request for continuance over the objections of Mapp and his counsel and rescheduled the trial for August 15, 2022. On August 10th, the court held a hearing to determine whether Mapp's second attorney could remain as Mapp's counsel based on this alleged conflict of interest, and over Mapp's objections concluded that the conflict was irreconcilable and ordered new counsel to be appointed. (*Id*. at 8.) On August 15, 2022, the court journalized an entry regarding the issue, and found as follows:

> Counsel for the Defendant has raised several conflict issues which hinders his ability to continue to represent the Defendant. These conflicts cannot be resolved by waiver by the Defendant and the witness to be called by the State and the witness to be called by the Defendant. * * *

> The Court is appointing new counsel for Defendant. Pursuant to Ohio Revised Code Section 2945.72(H) the Court is continuing the trial for a reasonable period other than upon motion of the accused. The Court finds that this continuance is reasonable and necessary.

> The Defendant is charged with Aggravated Murder and Attempted Murder, two very serious offenses with significant prison sentences if convicted. It would be extremely prejudicial to the Defendant to require his newly appointed counsel to proceed to trial on the day he has been appointed to this case.

> Under *State v. Mincy*, 2 Ohio St. 3d 6, the Ohio Supreme Court held when sua sponte granting a continuance under 2945.72(H) the trial court must enter the order of continuance and the reasons therefor by journal entry prior to the expiration of the limits prescribed in R.C. 2945.71. The Court finds that the time limits prescribed under R.C. 2945.71 have not expired.

> Based upon counsel's schedule, the Court's schedule and the time to prepare for trial this matter is continued from August 15, 2022 to October 24, 2022 at 9:00 AM.

(Aug. 15, 2022 Entry of Continuance.) The court appointed new counsel to Mapp on August 19, 2022, and Mapp's new attorney filed a new motion for discovery on August 22, 2022. On October 18, 2022, the state filed a notice of intent to use Evid.R 404(B) evidence, and the following day Mapp's new attorney filed a motion in limine to preclude the use of such evidence. The court held a hearing on Mapp's motion and denied it on October 24, and that afternoon, jury selection commenced. Jury selection was completed on October 25, and the jury was sworn in at 1:30 p.m. on that date. (Oct. 24, 2022 Tr. Vol. 9; Oct. 25, 2022 Tr. Vol. 10.)

{¶ 23} As noted above, 690 days passed between Mapp's indictment and his trial. But neither Mapp's counsel nor Mapp himself explicitly waived his right to a speedy trial for nearly 400 of those days, and another 5 were tolled by his request for a continuance of his arraignment at the outset of the case. R.C. 2945.72(H) (stating that the "period of any continuance granted on the accused's own motion" tolls speedy trial). And as the trial court held, the 71 days between August 15, 2022 and October 24, 2022 were directly attributable to the replacement of Mapp's conflicted counsel. Accordingly, the passing of those days was also due to a "reasonable continuance granted other than upon the accused's own motion" and further tolled Mapp's speedy-trial time under R.C. 2945.72(H).

{¶ 24} The state argues that the court should conclude that the 106-day continuance granted to protect Barton from COVID exposure would likewise qualify under R.C. 2945.72(H), and cites several cases from other districts that support its view. (*See* Brief of Appellee at 31-32 (citing cases).) Because the trial court did not specifically find those continuances to be "reasonable" under R.C. 2945.72(H) and because such a conclusion is

unnecessary to our analysis here, we decline to pass on this issue.  Moreover, we observe the motion to suppress filed by Mapp's second attorney would generally toll the speedy trial clock for the reasonable time it takes for the court to rule upon it.  *See, e.g., Brown*, 2019-Ohio-4735, at ¶ 35 and R.C. 2945.72(E). Given that those motions were outstanding and undecided during several of the continuances related to Barton's health concerns, and because Mapp has not argued that the time the trial court took to consider his motions was unreasonable, we cannot say that those continuances should be counted against Mapp's speedy-trial clock.

{¶ 25}  In sum, even if all the days of continuance granted over Mapp's objection are counted against his speedy-trial time—and we are by no means convinced that they should be so counted—he was brought to trial well within the 270-day speedy-trial period allowed by the statutes.  Accordingly, Mapp's first assignment of error is overruled.

> **Second Assignment of Error:** The trial court should not have allowed Cowan to testify over the defendant's objection, because his testimony was inadmissible and highly prejudicial.

{¶ 26}  In his second assignment of error, Mapp contends that all of Sylvester Cowan's testimony was inadmissible and that he was prejudiced thereby.

{¶ 27}  Evid.R. 404(B) provides that evidence of other acts "is not admissible to prove the character of a person in order to show action in conformity therewith." *See also State v. Curry*, 43 Ohio St.2d 66, 68 (1975) (holding that other acts evidence "is not admissible when its sole purpose is to show the [defendant's] propensity or inclination to commit crime").  But the evidence may be admissible "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or lack of accident."  Evid.R. 404(B)(2). Trial courts engage in a three-step analysis to determine the admissibility of "other acts" evidence. *State v. Williams*, 134 Ohio St.3d 521,

2012-Ohio-5695, ¶ 19. First, a court must "consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *Id.* at ¶ 20, citing Evid.R. 401. The court must then determine "whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B)." *Id.* Finally, the court must "consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice." *Id.*, citing Evid.R. 403. A trial court's decision to allow "other acts" into evidence is reviewed under an abuse of discretion standard. *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 66.

{¶ 28} There can be no dispute that Cowan's testimony is relevant—if believed, his testimony establishes Mapp's reason for shooting at Hardy and Barton, which is otherwise completely absent from the evidence. Cowan's testimony therefore fits within a permissible purpose set forth in Evid.R. 404(B), "proof of motive," and is in general terms admissible evidence. It is true that there was no proof, aside from Cowan's testimony regarding Mapp's alleged statements to him, that Mapp was engaged in drug transactions with Hardy, that Hardy stole drugs from Mapp, or that Mapp asked a friend to bribe Barton not to testify— in fact there was other evidence tending to negate all these claims. But Mapp's attorney comprehensively cross-examined Cowan on the inconsistencies in his testimony and the fact that Mapp's alleged admissions to him did not match much of the evidence from the scene, as well as the potential sentence reduction Cowan might receive for his cooperation. (Tr. Vol. 11 at 540-90, 593.) And in his closing argument, Mapp's attorney thoroughly reviewed and attacked Cowan's testimony. (Oct. 27 & 28, 2022 Tr. Vol. 12 at 655-63, 673-

75.) Moreover, the trial court offered a proper and comprehensive limiting instruction to the jury regarding Cowan's testimony. (*Id.* at 714-15.) We therefore cannot say that Cowan's testimony on its own was unfairly prejudicial.

{¶ 29} Mapp also argues that one statement in Cowan's testimony was inadmissible hearsay—specifically, he suggests that Cowan improperly testified that Mapp had told him that when Cheniqua Barton and Adrian Hardy first arrived at the bar and Mapp approached them, that Hardy had told Mapp "[d]on't pull out a gun. People in here. Everybody going to see it," and that after Hardy's statement Mapp had decided to wait for "another better opportunity." (Oct. 26, 2022 Tr. Vol. 11 at 535.) But prior to Cowan testifying to the jury on this statement, the court heard a proffer of the statement and detailed argument on Mapp's objection to the statement by the attorneys. (*Id.* at 525-34.) And the trial court admitted Cowan's testimony only in part—specifically, the court ruled that Cowan was not able to testify that Mapp had told him that Barton heard the statement Hardy made to Mapp, as Barton had already testified and had not been able to state she overheard such a statement. (*Compare* Tr. Vol. 11 at 526-30 with Tr. Vol. 10 at 365-66 (testimony of Cheniqua Barton).) The objection discussed at trial was that the testimony was prejudicial and had not been previously disclosed, not that it was hearsay. (*See* Tr. Vol. 11 at 526.) And with good reason—because it was not offered to prove the matter asserted, it is not hearsay at all. *See* Evid.R. 801(C). It was not offered to show that there were people in the bar, or that those people would see a gun if Mapp pulled one out—it was, in fact, offered primarily to establish Mapp's identity and to show why he *did not* pull out a gun at that time, why he waited for "another better opportunity," as Cowan indicated.

{¶ 30} Moreover, even if Hardy's statement to Mapp contained within Mapp's statement to Cowan somehow constituted hearsay, the trial court did not err by admitting

it. It related to an event that Hardy was perceiving at that precise moment, rendering it admissible hearsay under Evid.R. 803(1) ("A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter unless circumstances indicate lack of trustworthiness.").

{¶ 31} And even if the statement should not have been admitted at all, it was harmless. "Error in the admission or exclusion of evidence in a criminal trial must be considered prejudicial unless the court can declare, beyond a reasonable doubt, that the error was harmless, and unless there is no reasonable possibility that the evidence, or the exclusion of evidence, may have contributed to the accused's conviction." *State v. Jones*, 10th Dist. No. 07AP-771, 2008-Ohio-3565, ¶ 13, citing *State v. Bayless*, 48 Ohio St.2d 73, 106 (1976). Here, at the very worst, the challenged statements support Mapp's identity as the person who shot Hardy and Barton approximately an hour later. But the testimony of Barton, Bowser, the surveillance videos, and the stipulation that Mapp was the man in the green jacket, when taken together lead almost inextricably to the conclusion that Mapp was the person who shot Hardy and Barton that night, because the evidence of Mapp's identity and guilt is overwhelming even without Cowan's testimony. Accordingly, Mapp's second assignment of error lacks merit and is overruled.

> **Third Assignment of Error:** The State's evidence that Mapp committed these offenses was legally insufficient as a matter of law.

{¶ 32} Pursuant to *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, to determine whether a conviction is supported by sufficient evidence of guilt, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the

crime proven beyond a reasonable doubt." *Id.*, *following Jackson v. Virginia*, 443 U.S. 307 (1979).

{¶ 33} The only real issue in this case is one of identity—Mapp's defense both at trial and here is that he was not the shooter. But he stipulated that he was the man in the green jacket on the surveillance video, and the testimony of Barton and Bowser is sufficient to establish the identity of the man in the green jacket a.k.a "Shiz" as the person who shot Hardy and Barton.

{¶ 34} Mapp also argues that the evidence at trial was legally insufficient to establish prior calculation and design as required by R.C. 2903.01(A). But Barton's testimony, if believed, and the video surveillance showing Mapp encountering Hardy and Barton and trying to talk to Hardy, and later leaving the bar and heading toward the patio (the direction that Hardy and Barton had earlier gone), entering the bathroom for less than 20 seconds, opening the patio door and going out to the patio, and returning from the patio after less than a minute and after the shots were fired is sufficient to establish that Mapp acted with prior calculation and design. *Compare with State v. Taylor*, 78 Ohio St.3d 15, 20-22 (1997) (holding that "the presence of absence of 'prior calculation and design' * * * turns on the particular facts and evidence presented at trial," and that "two or three minutes is more than instantaneous or momentary under these circumstances, and is more than sufficient for prior calculation and design."

{¶ 35} Accordingly, Mapp's third assignment of error lacks merit and is overruled.

> **Fourth Assignment of Error:** The evidence weighed manifestly against convicting Mapp of each count.

{¶ 36} In his fourth assignment of error, Mapp argues that his convictions are against the manifest weight of the evidence. Determinations of credibility and weight of

the testimony are primarily for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. The jury, or the court in a bench trial, may take note of inconsistencies at trial and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964). And therefore, "[w]hen a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), *superseded by constitutional amendment on other grounds*, and quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). An appellate court considering a manifest weight challenge "may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 22, citing *Thompkins* at 387. Appellate courts should reverse a conviction as being against the manifest weight of the evidence only in the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 37} We cannot hold that this is an exceptional case where evidence weighs heavily against Mapp's conviction. The video evidence, the testimony of Barton, and the testimony of Bowers all support Mapp's identity as the person who committed these crimes. Alternative theories regarding the shooter's identity suggested by the defense at trial are not strongly rooted in the evidence—essentially, they relate to people who were nearby but

were not actually shown to be present when the shootings occurred. Mapp's argument under this assignment of error boils down to a suggestion that Cowan's and Barton's testimony was not believable. But he does not challenge either the video evidence or the testimony of Bowser, both of which clearly place him on the patio at the precise time the shootings occurred. This assignment of error is accordingly overruled.

> **Fifth Assignment of Error:** Mapp was denied his right to a fair trial through cumulative error.

{¶ 38} Finally, Mapp argues that he was denied his right to a fair trial based on cumulative error. Under *State v. DeMarco*, 31 Ohio St.3d 191 (1987), paragraph two of the syllabus, a conviction will be reversed when the cumulative effect of multiple "violations of the Rules of Evidence during trial" deprives a defendant of a fair trial even though the instances of error would not individually constitute cause for reversal. But the doctrine of cumulative error is not applicable to the present case, because Mapp has not identified multiple "violations of the Rules of Evidence during trial." Rather, he has identified only one—the decision allowing to allow Cowan's testimony. As a result, the *DeMarco* doctrine is inapplicable to Mapp's case, and his fifth assignment of error lacks merit, and is accordingly overruled.

{¶ 39} Having overruled Mapp's five assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

LUPER SCHUSTER and LELAND, JJ., concur.

———————————